ALICE JANE SNYDER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Snyder v. Commissioner
Docket No. 45192-85.
United States Tax Court
T.C. Memo 1987-539; 1987 Tax Ct. Memo LEXIS 531; 54 T.C.M. (CCH) 953; T.C.M. (RIA) 87539; October 22, 1987. *531 From 1977 through 1983, S a physician beginning her career in medicine, also engaged in horse breeding, training, selling and showing activities. She lost money from these activities in every year. During these years, all of her non-horse related income was from work performed as a resident in becoming qualified, successively, in radiology, pathology and blood-banking (except for small amounts received through the horse-related activities). On the facts, held, S engaged in the horse-related activities during 1977, 1978, 1979, 1980 and 1981 with the actual and honest objective of making a profit. One of S's horses broke a leg in 1982. Held further, since S failed to prove the fair market value of the horse immediately before and immediately after the accident and also failed to prove the horse's adjusted basis, S may not deduct a casualty loss for 1982. Section 1.165-7(a)(5), Income Tax Regs.
Frederick T. Rikkers, for the petitioner. Ronald J. Long, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined the following income tax deficiencies: Year
Deficiency
1977
$   665
1978
1,145
1979
1,415
1980
1,352
1981
1,371
The issues for decision are *532 (1) whether petitioner's horse activity was "engaged in for profit" under section 183, [1] and (2) whether petitioner sustained a casualty loss for 1982 resulting from an injury to a horse. FINDINGS OF FACT Some of the facts have been stipulated and as to those facts which have been stipulated without reservation, they are so found. The parties also make several additional, rather atypical, stipulations. The first of these is as follows: In lieu of her testimony at trial, Petitioner has prepared a written statement that is attached hereto as Petitioner's Exhibit 18. Respondent neither agrees nor disagrees with the accuracy of the contents of said statement. Exhibit 18 is a typed doubled-spaced narrative about petitioner's horse-related activities. The second atypical stipulation, dated October 27, 1986, is as follows: 14. In addition to Petitioner's written statement, Exhibit 18, if Petitioner were called to testify in this matter, she would state as follows: a. (Relative to *533 the casualty loss, the alleged injury to Undiscovered JC1706) The injury was a broken leg occurring on November 27, 1982, during normal training. The result of the injury was a total disability of the horse for the past four years. It has caused the horse to be lame and it now walks with a limp. The break will ultimately result in a fusing of the bone by the aggravation of developing arthritis. Because of the lameness, the fusion of the bone, the four-year period during which the horse could not be ridden or trained and the horse's current age of 15 years, all of the horse's value for sale to a prospective breeder, trainer or exhibitor has been lost. b. (Relative to the issue of whether Petitioner's horse breeding, training, selling and showing activities were activities entered into for profit) At all times relevant hereto, Petitioner owned no less than three [sic] and no more than five horses. Initially, two horses were purchased at the inception of the activity, one being a mare to be used in breeding and the other a gelding to be used in showing. The other horses owned by Petitioner were acquired by breeding Petitioner's mare, for which Petitioner paid breeding fees to the *534 stud owners. As a result of these activities, several horses were born, raised and trained by Petitioner. Specifically Joyous Justice was born to Petitioner's mare in 1978, was reared and trained by Petitioner and sold on April 29, 1983, for $ 3,500. The mare purchased by Petitioner that yielded said foal cost Petitioner $ 175. The stud fee for said foal was $ 100. Joyous Justice was the only horse sold by Petitioner during the years in question. Respondent neither agrees nor disagrees with the accuracy of the contents of the statement contained in this paragraph 14. The horse referred to in paragraph a. of the foregoing stipulation was purchased by petitioner on October 11, 1976, at a cost of $ 2,500. The Court finds as facts the statements contained in paragraphs a. and b. of stipulated paragraph 14, except the statement that the break will ultimately result in a fusing of the bone by the aggravation of developing arthritis, which we accept only as an informed prediction by petitioner. Also, we do not accept as a fact petitioner's statement as to the value of the injured horse after the accident. The Court does not wholly encourage parties to proceed in this manner. Statements *535 of the type in question reflect an abdication by the parties of their obligation under Rule 91 to stipulate to the fullest extent to which complete or qualified agreement can or fairly should be reached. If the parties are unable to so agree, they should seek the assistance of the Court through a motion to compel stipulation under Rule 91(f) or present evidence at the trial of the case for evaluation by the Court. Ex parte affidavits, to which these statements are somewhat akin, are not evidence. Rule 143(b). This case presents a striking example of the wisdom of this Rule. Respondent, having waived the opportunity to cross-examine petitioner under oath, proceeds on brief to attack her credibility. Petitioner, having failed to come forward to testify, now expresses her dismay at respondent's action and seeks to buttress her credibility by submission of a ratifying affidavit. [2]
The Court has now been asked to determine petitioner's profit motive under section 183 based upon written *536 declarations without having been afforded the opportunity of observing her demeanor as a witness. We, accordingly, proceed upon the basis that the statements in question will be dealt with as would any other self-serving testimony given some time after the fact, but as to which the opposing party has declined the opportunity to cross-examine. We are not bound by such evidence, nor is respondent deemed to have agreed to its probative value, but we nevertheless accord it such weight as we deem appropriate under the circumstances. See, e.g., Jenny v. Commissioner,T.C. Memo. 1983-1. Petitioner resided at Stoughton, Wisconsin, at the time she filed her petition. As of 1977, petitioner had completed the required training to be licensed as a medical doctor. From 1976 to November, 1978, she served a residency in diagnostic radiology. From November, 1978, through June, 1982, she served a residency in clinical pathology. From July, 1982, through June, 1984, she served a residency and held a fellowship in blood-banking. Petitioner was hired by the American Red Cross Badger Regional Blood Services as associate medical director on July 1, 1984, a position she continued to hold at the time *537 this case was submitted. Petitioner became board-certified in the specialties of clinical pathology and blood-banking in 1985. Petitioner's gross income from her residencies during the years in question was as follows: Tax Year
Amount
1977
$ 11,106
1978
13,483
1979
18,149
1980
17,808
1981
19,191
1982
19,807
1983
22,248
Petitioner has had over 20 years of experience in riding and studying horses. Her particular field of interest is described as "combined training" which requires the availability of a versatile horse capable of competing in three disciplines: dressage, [3] speed, and endurance. Petitioner's plan was to produce horses for sale for use in the three-mentioned disciplines. She planned to begin with the material she initially had available, which was a purebred but originally unregistered saddlebred mare with a show record in the horse sports mentioned, and a thoroughbred gelding, which had been retired from racing but which had potential for competition in the three disciplines. By breeding to produce horses for sale and buying horses for resale after training, petitioner projected that the horse operation would support itself within five or six years. By that time she anticipated that *538 her training as a radiology resident would be completed and she would have an anticipated income of at least $ 100,000 per year. This would put her in a position to buy her own facility and branch out into thoroughbred breeding for the racetrack. She understood that the potential profits from breeding thoroughbred race horses are much greater than from breeding riding horses, enough to hope that eventually she could retire from radiology. As it developed and despite careful planning, petitioner's expectations failed to materialize, and as of January, 1984, petitioner ceased her horse-related operations. After more than seven years of unsuccessful effort involving almost all the spare time left over from her demanding career as a physician, petitioner was physically fatigued and decided to dispose of her breeding stock. Petitioner attributed her failure to develop a successful operation to the following factors: 1. Her selection as breeding stock of an unpopular breed among *539 dressage and event riders was made at a time when European "warm bloods" were being imported and promoted heavily for this market. 2. Her naivete regarding advertising, which assumed that good horses sell themselves and that what appears highly desirable in an eastern market is also highly desirable in the midwest. 3. Too small an operation. 4. An overall economic depression in the entire horse market continuing into 1984. During the years at issue, petitioner entered her horses in various shows and schools with a reasonable amount of success. During the years 1977 to 1982, inclusive, petitioner claimed gross receipts and expenses with respect to her horse breeding, training, selling and showing activities in the following amounts: [4]
Year
Gross Receipts
Expenses
Net Loss Claimed
1977
$   0
$  3,140
$  3,140
1978
80
5,612
5,532
1979
50
5,364
5,314
1980
0
6,211
4,975
1981
0
5,951
4,850
1982
70
6,375
6,305
TOTALS
$ 200
$ 32,653
$ 30,116
Petitioner maintained careful records of her horse-related activities, which she carried on in a business-like manner. Appendix *540 A is a schedule of petitioner's inventory of horses and activities for 1977 to 1983, inclusive. Petitioner participated in the following number of horse shows and training schools for the period 1977 to 1983, inclusive: Year
Number of Events
1977
7
1978
14
1979
11
1980
4
1981
7
1982
8
1983
4
In addition, petitioner took her horse, Pauper's Pride, to various locations for breeding purposes on four separate occasions during the years in question. OPINION The first question for decision is whether petitioner's horse breeding, training, selling and showing activities were collectively an "activity not engaged in for profit" within the meaning of section 183(a). This section provides the general rule that if an individual engages in an activity, "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(c) defines an activity not engaged in for profit as follows: (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year *541 under section 162 or under paragraph (a) or (2) of section 212. The standard for determining whether an individual is carrying on a trade or business so that the expenses related thereto are deductible under section 162, or whether the individual is engaged in activities for the production or collection of income or for the management, conservation or maintenance of property held for the production of income so that the expenses are deductible under section 212, is: did the individual engage in the activity "with the actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although the taxpayer's expectation of profit need not be reasonable, the facts and circumstances must indicate that the taxpayer had the requisite profit objective. 78 T.C. at 645. Petitioner has the burden of proving that she had the requisite profit motive. Allen v. Commissioner,72 T.C. 28, 34 (1979); Rule 142(a). Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors, which were derived prinicpally from case law, to be considered in determining whether an activity is engaged in for profit. *542 Allen v. Commissioner,72 T.C. at 33. These factors are listed in the footnote below. [5] *543 As we held in Allen v. Commissioner,72 T.C. at 34, the issue is one of fact to be resolved not on the basis of any one factor but on the basis of all the surrounding fact and circumstances, and the regulations also so provide. See section 1.183-2(b), Income Tax Regs. The record reveals that petitioner, a physician at the threshold of her career, was a highly motivated and well organized individual whose admirable character traits appear to have caused her reach to exceed her grasp. During the years in issue, petitioner as a medical resident was successively qualifying in the three medical specialties of radiology, pathology and blood-banking. At the same time, she was attempting to get started in her professed business of horse breeding, training, selling and showing. There is no indication that petitioner had any physical assistance in the latter activity. As our findings of fact indicate, petitioner kept accurate records of the financial aspects of her horse business activities. She was also knowledgeable about horses and experienced in dealing with them. Unfortunately, her enthusiasm and training skills were not matched by her business acumen or financial resources. We have carefully considered petitioner's written submission in lieu of testimony and find it to be inherently logical and bearing the ring of truth. In it, petitioner ably delineates her steadily diminishing expectations for the success of her enterprise, leading eventually to a frank admission that making a success of the business she commenced with rather high hopes was beyond her physical and financial means. In this connection we note that throughout the entire period during which she conducted *544 her horse-related activities, petitioner's only source of income was the money she earned as a medical resident and that her gross income from her residencies ranged from a low of $ 11,106 in 1977 to a high of $ 22,248 in 1983. Considering the amounts expended by petitioner in her effort to start and continue her horse-related activities, one can only conclude that petitioner must have led a rather Spartan existence during these years, to say the least. Petitioner states in her written submission that she intended to breed the mare two years in a row initially, then every other year using thoroughbred stallions with successful show records. On the basis of personal experience, advertisements in national magazines and published articles, petitioner expected to sell a young horse of suitable athletic ability, with beginning training and perhaps some show experience, for $ 5,000 to $ 10,000. The projected schedule of sales was: 1981--sale of 1977 foal ($ 6,500); 1982--sale of 1978 foal ($ 5,500); 1984--sale of 1980 foal ($ 4,000); 1986--sale of 1982 foal ($ 5,000). Petitioner's mare was registered in 1978 after several years' effort to trace the former owners. Petitioner expected *545 to retrain the thoroughbred gelding and show him at various events as advertising of her ability to judge horse's athletic potential and her ability as a trainer. She also expected to sell the retrained gelding in 1983 for $ 10,000. In 1981, petitioner commenced advertising in the publication known as "Chronical of the Horse," but had poor results. She then consulted a professional person who had judged one of petitioner's horses (described as "the 1977 crossbred mare"), who advised her to keep the mare because it had the potential to go to the Grand Prix level. She understood that horses at this level of competitive dressage were advertised at prices starting at $ 35,000. In 1982, her show gelding broke a leg and this was an added reason why petitioner decided to retain the mare; i.e., so that she would have a horse to show. In 1983, petitioner decided to sell two purebred saddle horses, for which she obtained considerable relatively good response to the advertisements which she had placed for their sale. Ultimately, except for the sale of one horse for $ 3,500, none of petitioner's plans proved to be successful, and in January, 1984, she decided to stop conducting her operation *546 as a business and to sell all of her horses as soon as possible. In short, petitioner did breed, train and show horses during the period involved, but as a business venture her efforts were completely unsuccessful. As already indicated, though perhaps revealing undue optimism on petitioner's part as to the chances for success, her written submissions are nevertheless for the most part persuasive. We believe that petitioner started and continued her horse breeding activities in order to make a profit, but by the end of the years of the period in question, she wisely recognized the unlikelihood of future success and terminated her activities. While it is very likely that petitioner simply could no longer afford the operation, it seems possible that were she merely indulging a hobby she might have curtailed her activities to a level which she could afford. Instead, she abandoned the entire operation. Petitioner's losses were real, out-of-pocket losses and not merely tax losses. As revealed by her tax returns, she did not have other income to fall back on; her horse activities were financed solely from her current and rather meager wages. While there certainly may have been an *547 element of "pleasure" in petitioner's horse-related activities, it appears to have been the kind of pleasure connected with any worthwhile, dedicated work. No doubt the same could be said of her work as a medical resident. We conclude that, for the years in issue, petitioner engaged in her horse activities with an actual and honest albeit misguided objective of making aprofit, and we hold for petitioner on this issue. See Yancy v. Commissioner,T.C. Memo. 1984-431. In her petition petitioner asserts, as a new issue, that she is entitled to a casualty loss for the year 1982 in the amount of $ 2,500 resulting from injury to her horse, Undiscovered JC1706. Petitioner purchased this horse on October 11, 1976, at a cost of $ 2,500. The horse sustained a broken leg on November 27, 1982, during normal training. The result of the injury was a total disability of the horse for four years. At the time of the injury, the horse was approximately 11 years old. For the years in question, the regulations provide that the amount deductible as a casualty loss is the lesser of the "amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair *548 market value of the property immediately after the casualty" or "the amount of the adjusted basis prescribed in § 1.1011-1 for determining the loss from the sale or other disposition of the property involved." Section 1.165-7(b)(1)(i) and (ii), Income Tax Regs. Petitioner has the burden of proof on this issue. Rule 142 (a). Aside from a rather general speculation that the horse was worth as much as $ 10,000 before the accident and was worthless afterwards, petitioner has introduced no objective evidence as to the fair market value of the horse either before or after the accident or as to its adjusted basis. Petitioner asserts that for all practical purposes the horse was valueless after the accident because it was lame, likely to develop arthritis and could not be ridden for four years. Nevertheless, she kept the horse. Since petitioner has failed to prove any amount of casualty loss to which she might be entitled, none is allowable, and we hold for respondent on this issue. To reflect the foregoing, Decision will be entered under Rule 155.
APPENDIX a
1977 INVENTORY OF HORSES (AT END OF YEAR)
1. Pauper's Pride, unregistered 1964 black Saddlebred mare
2. Undiscovered JC71706, registered *549 1971 bay Thoroughbred gelding
3. Sam's Pride, unregistered 1977 chestnut crossbred filly (produce of #1)
1977 ACTIVITIES
Produced 1 foal (#3)
Bred broodmare (#1) for 1978 foal
Showed (#2)
1978 INVENTORY OF HORSES (AT END OF YEAR)
1. Pauper's Pride ASHBA 94313 registered 1964 black Saddlebred mare
2. Undiscovered JC71706 registered 1971 bay Thoroughbred gelding
3. Sam's Pride ARA THB42259-2 registered 1977 crossbred filly (produce of #1)
4. Joyous Justice ASHBA 71458 registered 1978 black colt (produce of #1)
1978 ACTIVITIES
Produced 1 foal (#4)
Obtained registrations on 3 animals (#1, 3, 4)
Showed (#2)
1979 INVENTORY OF HORSES (AT END OF YEAR)
1. Pauper's Pride ASHBA 94313 registered 1964 black Saddlebred mare
2. Undiscovered JC71706 registered 1971 bay Thoroughbred gelding
3. Sam's Pride ARA THB42259-2 registered 1977 chestnut crossbred filly (produce of #1)
4. Joyous Justice ASHBA 71458 registered 1978 black Saddlebred colt (produce of #1)
1979 ACTIVITIES
Bred mare (#1) for 1980 foal
Showed (#2)
1980 INVENTORY OF HORSES (AT END OF YEAR)
1. Pauper's Pride ASHBA 94313 registered 1964 black Saddlebred mare
2. Undiscovered JC71706 registered 1971 bay Thoroughbred gelding
3. Sam's Pride ARA THB42259-2 *550 registered 1977 chestnut crossbred filly (produce of #1)
4. Joyous Justice ASHBA 71458 registered 1978 black Saddlebred gelding (produce of #1)
5. Elko's Pride unregistered 1980 chestnut crossbred filly (produce of #1)
1980 ACTIVITIES
Produced 1 foal (#5)
Began training (#3)
Showed (#2)
1981 INVENTORY OF HORSES (AT END OF YEAR)
1. Pauper's Pride ASHBA 94313 registered 1964 black Saddlebred mare
2. Undiscovered JC71706 registered 1971 bay Thoroughbred gelding
3. Sam's Pride ARA THB42259-2 registered 1977 chestnut crossbred mare (produce of #1)
4. Joyous Justice ASHBA 71458 registered 1978 black Saddlebred gelding (produce of #1)
5. Elko's Pride unregistered 1980 chestnut crossbred filly (produce of #1)
1981 ACTIVITIES
Leased broodmare (#1) for breeding purposes; lessee provided board & paid breeding-related expenses in exchange for foal to be produce in 1982
Began training (#4)
Showed (#2, 3)
Advertised for sale (#3)
1982 INVENTORY OF HORSES (AT END OF YEAR)
1. Pauper's Pride ASHBA 94313 registered 1964 black Saddlebred mare
2. Undiscovered JC71706 registered 1971 bay Thoroughbred gelding
3. Sam's Pride ARA THB42259-2 registered 1977 chestnut crossbred mare (produce of #1)
4. Joyous Justice ASHBA *551 71458 registered 1978 black Saddlebred gelding (produce of #1)
5. Elko's Pride unregistered 1980 chestnut crossbred filly (produce of #1)
1982 ACTIVITIES
Broodmare (#1) produced half-Arabian foal as result of lease arrangement
Showed (#2, 3)
Advertised for sale (#3)
Note: In 1982, #2 broke his leg; estimated recovery period 2 years.
1983 INVENTORY OF HORSES (AT END OF YEAR)
1. Pauper's Pride ASHBA 94313 registered 1964 black Saddlebred mare
2. Undiscovered JC71706 registered 1971 bay Thoroughbred gelding
3. Sam's Pride ARA THB42259-2 registered 1977 chestnut crossbred mare (produce of #1)
5. Elko's Pride unregistered 1980 chestnut crossbred filly (produce of #1)
6. Hickory Red Wing ASHBA 80913 registered 1981 bay Saddlebred colt
1983 ACTIVITIES
Bred mares (#1, 3) to produce 1984 foals
Advertised for sale (#1, 4); Sold (#4) for $ 3,500.00
Bought & registered Saddlebred colt for future use as breeding stallion)
Showed (#3)
Began training (#5)
Note: In 1983, the proprietor had a broken leg. Footnotes
1. Unless otherwise noted, all section references are to sections of the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. We consider this affidavit superfluous because respondent has already agreed as to what petitioner's testimony would have been at trial, which testimony would, of course, have been given under oath. ↩
3. The term "dressage," according to Webster's New Collegiate Dictionary, means "the execution by a horse of complex maneuvers in response to barely perceptible movements of a rider's hands, legs, and weight." ↩
4. These amounts are reflected on the returns. The parties stipulated different amounts for 1981 and 1982. The stipulated amounts are not explained. ↩
5. (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.