SANTO J. TRAFFICANTE and GERALDINE L. TRAFFICANTE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Trafficante v. Commissioner
Docket No. 14676-88
United States Tax Court
T.C. Memo 1990-353; 1990 Tax Ct. Memo LEXIS 365; 60 T.C.M. (CCH) 110; T.C.M. (RIA) 90353; July 11, 1990, Filed Decision will be entered under Rule 155. Charles F. Clark and Matthew J. Foster, for the petitioners.
Francis C. Mucciolo and William R. McCants, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1983 and 1984 in the respective amounts of $ 35,965 and $ 26,083. The only issue for decision is whether petitioners' horse operation was not engaged in "for profit" within the meaning of section 183. [1]
*367 FINDING OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits are incorporated herein by this reference. At the time of filing their petition, petitioners resided in Tampa, Florida. Petitioners were married and filed joint Federal income tax returns for 1983 and 1984. (Singular reference to "petitioner" will denote Santo J. Trafficante.) From 1963 until 1980 petitioner worked at J. C. Valenti and Company in Tampa, Florida. Petitioner's wife, Geraldine, owned a 24-percent interest in J. C. Valenti and Company and received a substantial amount of income from this interest. Petitioner first became interested in the horse business in 1979 when he purchased a one-half interest in the horse "Flying Bird". At this time he had no prior experience with horses. From 1979 to 1988 petitioner owned approximately 40 different horses, some by purchase and some by his breeding activity. During 1983 and 1984, the tax years in question, petitioner owned about 17 horses, including mares, foals, racing stock, and interests in stallions for stud services. The horses were all bred and used for thoroughbred racing or breeding, not for *368 pleasure riding. A schedule of the horses petitioner owned, their cost and sales price is set forth in the Appendix. After purchasing his first horse, petitioner started reading books and publications about horses. He also inquired about professional horse trainers and was introduced to Mr. Arthur Pedegral, Jr., who had excellent credentials as a horse breeder and trainer. Mr. Pedegral bred quarter horses and in 1976 began training thoroughbred horses. At various times Mr. Pedegral has been a licensed trainer in the States of Florida, Kentucky, Ohio, Louisiana, and New Jersey. For several years he was the leading trainer at Tampa Downs, and in the standings for leading trainers at several other race tracks. Petitioner and Mr. Pedegral decided to buy land for a horse farm in 1980. Mr. Pedegral purchased 10 acres and sold 5 of them to petitioner. The next year petitioner purchased 10 acres adjacent to his and Mr. Pedegral's farm. After selling interests to two friends, petitioner eventually owned a one-third interest in 15 acres, and Mr. Pedegral owned 5 acres alone. Mr. Pedegral built a house and resided on part of his 5 acres. Mr. Pedegral also constructed a barn equipped *369 with a closed circuit television to monitor the horses. Petitioner purchased the lumber for the barn and for a fence to cover the original 10 acres. Mr. Pedegral provided the labor needed to construct both the barn and fence. At the entrance to the farm on both sides of the road, a wall was built with the name "Argwen Farm" displayed. Argwen Farm is the name Mr. Pedegral used for his horse operation. Petitioner named his horse operation "San Jose Stables"; however, the name did not appear on the wall. Mr. Pedegral trained and boarded petitioner's horses. Petitioner stayed in contact with Mr. Pedegral by telephone, but did not spend a substantial amount of time at the horse farm. Mr. Pedegral kept petitioner's horses in the barn when they were sick or foaling, and on various parts of the 20 acres at other times. Mr. Pedegral also boarded and trained his own and other people's horses, and kept them either in the barn or on the 20 acres. Mr. Pedegral charged petitioner the same fee he charged everyone else for whom he trained horses. Mr. Pedegral charged petitioner the local going rate for the horses that were boarded. Petitioner never purchased a horse without discussing it with *370 Mr. Pedegral. Usually mares were bought so they could be used for breeding once their racing career ended. Four horses were purchased and used solely for racing. However, none proved successful and petitioner sold them all in 1981. Petitioner owned 10 broodmares that produced 26 foals. Five of the foals died. Petitioner gave several horses away that were not valuable as race horses, or for breeding. In 1983 and 1984 petitioner also purchased interests in two stallions to help reduce stud fees. In 1984 petitioner was arrested, but all the charges were later dropped. The State of Florida banned petitioner from racing his horses. The ban was eventually lifted, but for a period of time petitioner was unable to race his horses. Petitioner maintained a separate checking account for San Jose Stables. Funds for purchasing a horse came from a checking and savings account held jointly with Geraldine Trafficante. Petitioner deposited funds obtained from horse sales into the bank account that needed it. At the end of each year, petitioner's accountant summarized all the information relating to the horse operation. In each taxable year from 1979 through 1988 petitioner sustained losses *371 on his horse operation as follows: Schedule C Income
Schedule C
Net
Year
and Form 4797 Gains
Expenses
Loss
1979
$     870.00
$ 7,551.79
$  6,681.79
1980
4,349.00
31,118.63
26,769.63
1981
13,422.05
53,385.29
39,963.24
1982
46,587.50
88,525.52
41,938.02
1983
150.00
63,080.85
62,930.85
1984
24,923.00
77,546.00
52,623.00
1985
69,769.00
92,139.00
22,370.00
1986
(19,730.00)
60,857.00
80,587.00
1987
2,724.00
65,632.00
62,908.00
1988
5,915.00
31,967.00
26,052.00
Petitioner engaged in several other business activities during the period he operated the horse operation. In 1981 petitioner obtained a real estate license and made some profits from real estate transactions. He also owned a wholesale car business, restaurant, and tomato farm for short periods of time. The restaurant and tomato farm both lost money. In 1988 petitioner abandoned the horse operation, sold all of his horses, but kept a one-third interest in 15 acres of the farm. OPINION The central issue is whether petitioner's horse operation was an activity not engaged *372 in for profit. Section 183 disallows certain deductions attributable to an activity not engaged in for profit. [2]Section 183(c) defines an "activity not engaged in for profit" as any activity other than one for which deductions are allowable under section 162 (relating to trade or business expenses), or section 212(1) or 212(2) (relating to expenses for the production or collection of income, or for the management, conservation or maintenance of property held for the production of income). *373 Respondent contends that breeding and racing are separate activities for purposes of section 183(c), and that petitioner failed to establish what activity he engaged in for profit. We do not agree. In determining whether a taxpayer engaged in two or more activities for purposes of section 183, section 1.183-1(d)(1), Income Tax Regs., provides that all the facts and circumstances of the case must be taken into account. The most significant facts in making this determination are the degree of organizational and economic interrelationship, the business purpose for carrying on the various activities separately or together, and the similarity of the activities. The Commissioner will usually accept the characterization by the taxpayer as either a single activity or as separate activities, unless the characterization appears to be artificial and not supported under the facts and circumstances of the case. Sec. 1.183-1(d)(1), Income Tax Regs; Keanini v. Commissioner, 94 T.C. 41 (1990). We find petitioner's characterization of the horse operation as a single activity for purposes of section 183 to be fully supported by the facts. A close relationship exists between *374 breeding and racing thoroughbred horses. A foal's value initially is determined from his bloodlines. So if the broodmare or stallion were winning race horses, the foal's value should be relatively high. Thus, if a broodmare or stallion produces a successful race horse, other offspring by the same broodmare or stallion should become more valuable. Breeders can choose to immediately sell a foal or to keep the foal and train it for racing. Once a foal is trained, breeders hope the foal wins several races so its value will increase along with the broodmare, stallion, and any offspring the broodmare or stallion produces. Petitioner initially carried on both breeding and racing, but by 1981 all the horses purchased solely for racing were sold. After this, petitioner only raced mares until they were ready for breeding and some foals which he felt had a chance to be successful race horses. Petitioner carried on the breeding operation, and used racing to try to increase the value of his horses. The breeding and training operations were carried on as a single, integrated business with horses being used in both activities. *375 Petitioner kept all the horses on the horse farm, and Mr. Pedegral cared for all the horses whether they were foals, broodmares, or racing stock. Thus, we find a close organizational and economic relationship exists between the breeding and racing activities. See Mary v. Commissioner, T.C. Memo. 1989-118; Yancy v. Commissioner, T.C. Memo. 1984-431. Accordingly, we determine that, for purposes of section 183, the horse operation was a single activity. We next consider whether petitioner engaged in the horse operation with the objective of making a profit. Horse-related activity may constitute a trade or business for purposes of section 162. Engdahl v. Commissioner, 72 T.C. 659, 665 (1979). A taxpayer need not prove that he had a reasonable expectation of profit in order to establish that he engaged in the activity for profit; he must show, however, that he entered into or continued the activity with an "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion *376 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Whether a taxpayer engaged in an activity with the requisite objective of making a profit is one of the facts to be resolved on the basis of all the surrounding facts and circumstances. Lemmen v. Commissioner, 77 T.C. 1326, 1340 (1981); sec. 1.183-2(b), Income Tax Regs. The burden of proving the requisite objective is on petitioner. Sabelis v. Commissioner, 37 T.C. 1058, 1062 (1962); Rule 142(a). Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors which should normally be considered in determining whether an activity is engaged in for profit. Benz v. Commissioner, 63 T.C. 375, 382-383 (1974). The factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayers or his advisors; (3) the time and effort expanded by the taxpayer in carrying on the activity; (4) the expectation the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying *377 on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. No single factor is controlling. Golanty v. Commissioner, supra at 426; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(b), Income Tax Regs.
We have listened to the testimony of petitioner, Santo J. Trafficante, and have observed his demeanor, and we are convinced that he had an actual and honest objective of making a profit. Respondent contends that petitioner engaged in the horse activity to sustain tax benefits to offset Mrs. Trafficante's substantial income from J. C. Valenti and Company. Section 1.183-2(b)(8), Income Tax Regs., points out that the expectation of being able to arrange to have the tax collector share in the cost of a hobby may often induce an investment in such a hobby which would otherwise not occur. *378 Engdahl v. Commissioner, supra.We have noted that in cases of this kind, the concurrent existence of income poses the question rather than answers it. Engdahl v. Commissioner, supra at 670. If there is no other income there can be no tax benefit and as long as the tax rates are less than 100 percent, there is no "benefit" in losing money. Engdahl v. Commissioner, supra.The essential question remains whether there was an actual and honest objective of making a profit. From 1979 to 1988 petitioner expended substantial funds on purchasing, feeding, boarding, and training horses. Furthermore, twenty-six foals were bred from petitioner's ten broodmares, costing thousands of dollars in stud services. Petitioner did not purchase the horses solely for his personal pleasure, and none of the forty horses were ever bred or used for pleasure riding. It seems highly unlikely that a person would expend substantial amounts of funds to purchase and breed so many horses for a hobby or tax benefits in which no pleasure is derived. See *379 Yancy v. Commissioner, T.C. Memo. 1984-431. While it is true that petitioner never recognized a profit, we note that a series of losses during the initial stage of an activity does not necessarily indicate that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. Moreover, losses sustained because of unforeseen or fortuitous circumstances beyond the control of the taxpayer do not indicate that the activity was engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.
The start-up phase for a horse breeding operation is 5 to 10 years. Engdahl v. Commissioner, supra at 669. The years in issue fall within this start-up period. In addition, petitioner's losses can be explained by a series of unfortunate events and his lack of business expertise. Petitioner engaged in five different activities since 1980 in the hope of recognizing a profit, including 1) selling cars wholesale, 2) operating a restaurant, 3) tomato farming, 4) real estate transactions, and 5) the horse operation. Only two of the activities ever proved profitable. Despite his efforts petitioner has not been very successful in recognizing profits *380 from most of his activities. The horse operation was one of the activities that proved unprofitable, and like the other two, it was eventually abandoned. If the horse operation were a mere hobby, activity for pleasure, or a business founded solely for tax benefits, it would not seem petitioner would entirely abandon the operation. See Snyder v. Commissioner, T.C. Memo. 1987-539. Moreover, some of the losses from the horse operation can be attributed to several unforeseen circumstances. Several of petitioner's horses died unexpectedly. One in particular, "Backseat," produced two foals which sold for $ 40,000 and $ 24,450 respectively; unfortunately, the broodmare suddenly died after the second birth. Four foals died for unknown reasons, and three had to be given away because they were not suitable for racing. During a "claim race," petitioner also purchased a horse which had the potential to earn substantial winnings. However, after the race it was learned that the horse had chipped a bone in its knee. Petitioner also had various problems because he had the same name as an alleged Mafia leader. This, along with his arrest, played a part in his ban from the *381 race tracks. Petitioner could not race any horses during the ban, and had to sell foals instead of racing them to increase their value. These events, along with the unpredictability in a horse operation, played a significant part in the losses petitioner sustained. Petitioner did keep complete records of his horse business and operated it in a businesslike manner. See sec. 1.183-2(b)(1), Income Tax Regs. Petitioner commingled funds from the horse operation with personal funds, but records were kept as to the expenses and receipts relating to the horse operation. In fact, the parties stipulated that the expense records were sufficient and substantiation was not an issue. Nevertheless, respondent emphasized that petitioner never prepared a profit and loss statement during the year, and argued that this showed the business was not carried out in an appropriate manner. However, petitioner's accountant testified that a profit and loss statement was not required or useful in petitioner's business. Furthermore, the speculative nature of a horse operation does not lend itself well to predicting profits. It is hard to predict how long or how successfully a horse will race in a particular *382 year, or if a broodmare will be successful in foaling a valuable colt or filly. In light of these facts, we conclude the petitioner's manner of operation indicates an objective to make a profit. Viewing the record as a whole, we conclude that petitioner engaged in the horse operation with the actual and honest objective of making a profit. Accordingly, petitioners' losses from the horse operation for 1983 and 1984 are not subject to the limitations contained in section 183(b). To reflect the foregoing. Decision will be entered under Rule 155.
APPENDIX DATE SOLD
HORSE
OR TRANSFERRED
COST
SALES PRICE
1.
Great Above/Carefree Cynthia
1981
0 [3]  $  9,500.00
2.
Dance Easy
1981
$  3,640.00
3,500.00
3.
Don't Disgust Us [4]
1981
5,000.00
2,000.00
4.
Holy Guacamole
1981
10,000.00
9,025.00
5.
Flying Bird 1/2 [5]
1981
5,000.00
5,000.00
6.
Great Above/Carefree Cynthia
1981
0     9,500.00
7.
No Double/Backseat
1982
0     40,000.00
8.
Elusive Ribot/County Airport
1982
0     2,487.00
9.
Day Manager (broodmare) [6]
1982
2,500.00
700.00
10.
Striking Appeal
1982
0     died   11.
Nalee's Man/El Cinco Casas
1982
0     5,900.00
12.
Carefree Cynthia * [7] (broodmare)
1983
6,000.00
2,500.00
13.
County Airport * (broodmare)
1983
10,000.00
2,000.00
14.
Burning Log
1983
0     3,600.00
15.
Irish Ruler/County Airport
1983
0     gift   16.
Nicholm II/Backseat
1984
0     24,450.00
17.
Run Marisa Run
1984
0     7,500.00
18.
Backseat (broodmare)
1985
26,000.00
died   19.
Staff Member
1985
0     gift   20.
Best of the Lot
1985
0     1,000.00
21.
Payne's Prairie
1985
0     5,000.00
22.
Shrewd's Glory
1985
0     12,500.00
23.
Chavalon's Day * [8] (broodmare)
1986
67,000.00
20,500.00
24.
C'mon Canoli
1986
0     1,000.00
25.
Red Wing Bold/Lot's New
1986
0     died   26.
Chop Chop Tomohawk/Chavalon's Day
1986
0     died   27.
Threshold's Image
1986
0     gift   28.
Double Sonic/Lot's New
1986
0     died   29.
Lucky To Make It
1987
0     1,000.00
30.
Shrewd Jude (broodmare)
1988
5,600.00
3,700.00
31.
El Cinco Casas 1/2 (broodmare)
1988
19,000.00
350.00
32.
Cinderella's Wand (broodmare)
1988
33,000.00
3,700.00
33.
Lot's New (broodmare)
1988
10,920.00
gift   34.
Charming Turn (stallion) [9]
1988
15,000.00
1,300.00
35.
At the Threshold (stallion)
1988
30,000.00
13,000.00
36.
She's So Charming (broodmare)
1988
45,000.00
died   37.
Valaschar
1988
0     20,000.00
38.
Shrewd's Charm
1988
0     3,000.00
39.
Foreign Power/El Cinco Casas 1/2
1988
0     550.00
40.
Nat's Fling
1988
0     1,800.00
41.
Ataschar
1988
0     4,500.00
*383 *384  Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Section 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT (a) GENERAL RULE - In the case of an activity engaged in by an individual * * *, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE - In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed - (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩
3. A zero cost means that petitioner owned the broodmare at the time of foaling.↩
4. Petitioner purchased this horse during a "claim race." After the race it was discovered that the horse had a bone chip in his knee. Petitioner spent $ 1000.00 to have the knee repaired but the horse never raced the same.↩
5. A "1/2" indicates petitioner owned a one-half interest in the horse. The cost and sales price listed is limited to petitioner's percentage.↩
6. Petitioner purchased this horse solely as a broodmare; however, she never conceived.↩
7. A "*" indicates petitioner purchased a broodmare who was with foal. The purchase price reflects the value of the broodmare and the foal.↩
8. Chavalon's Day was in foal when purchased. Petitioner insured the foal for $ 50,000.00. The foal died and petitioner recovered the insurance proceeds.↩
9. The word "stallion" indicates petitioner bought a share in the horse's stud service. This entitled petitioner to one free breeding every year for one of his broodmares, and two free breedings every fifth year.↩